Filed 7/15/14  P. v. Rainwater CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# COPY

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C066609 |
| Plaintiff and Respondent, | (Super. Ct. No. CR62727) |
| v. | |
| JOHN ALLEN RAINWATER, | |
| Defendant and Appellant. | |

Defendant John Allen Rainwater appeals from an order committing him to the State Department of Mental Health for an indeterminate term after a jury found him to be a sexually violent predator (SVP) within the meaning of the Sexually Violent Predators Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.; unless otherwise stated, statutory references that follow are to the Welfare and Institutions Code).  Defendant contends insufficient evidence supports the verdict, the trial court twice erred when instructing the jury, the court erroneously denied his motion for new counsel and his motion to dismiss

1

for violating his due process right to a speedy trial, and that his special counsel, appointed to represent him on his motion to dismiss, was ineffective. Defendant also argues his indeterminate commitment violates the equal protection, ex post facto, and double jeopardy clauses of the federal constitution. We conclude none of defendant's contentions have merit and affirm the commitment order.

FACTS AND PROCEEDINGS

A.      Juvenile and Criminal History

Defendant began assaulting small boys, all of whom were strangers to him, when he was very young. In 1974, when defendant was 10, he lured a four-year-old boy to a secluded area and severely beat him in the head with a two-by-four. He pulled chucks of the boy's hair out, pulled his pants down and looked at the boy's buttocks. Defendant was arrested, made a ward of the state, and placed in a mental facility. Several group home placements followed.

At 13, shortly after being released from a group home, defendant accosted a seven-year-old boy he saw playing near a ditch. He forced the boy's pants down and masturbated the boy and himself. That same year, defendant told another seven year old boy he encountered about magic rocks in some nearby bushes. After luring the child into the bushes, defendant forced the child to masturbate him and defendant masturbated the child. Defendant admitted to orally copulating both boys. Based on these assaults, defendant was arrested for child molestation and later pleaded guilty to annoying a child. He was placed in several more group homes.

Defendant was eventually released to his parents when he was 15. Like before, he sought out and molested more victims a short time later. He saw a seven-year-old boy walking home from swimming lessons. Defendant was riding a bike and enticed the boy to get on the bike by telling him he would buy him a soda. Defendant rode to a secluded area, slapped the child in the face and threatened him, pulled his pants down, put his

2

mouth on the child's buttocks, and also forced the child to masturbate him. He also tried to sodomize the boy. Later that year, defendant was out trolling for another victim. He approached an 11-year-old boy walking home from school and forced the boy onto his moped. He drove the boy to a closed drive-in movie theater. After slapping the boy and forcing him to undress, he orally copulated and sodomized the child. Defendant threatened to kill the boy if he told. For these offenses, defendant was charged with sodomy, child molestation, oral copulation, kidnapping, and assault and battery. He pleaded to child molestation and was sentenced to six years in the California Youth Authority.

When he arrived at the Youth Authority, defendant volunteered for the WINTU program, which provides treatment in a therapeutic setting. While at WINTU, defendant wrote that he thought about killing himself, his parents, and a staff member and his little boy, had killed animals for no reason, and fantasized about watching little boys cry in pain as he molested them. Defendant also wrote about plans to escape.

On November 23, 1981, when he was 17, defendant did escape with the intent to molest more victims. Within 24 hours, he accosted two young boys, aged 10 and 11. Defendant encountered the friends coming home from school. He lured them to the railroad tracks under the guise of seeing a train wreck. Defendant grabbed the boys and forced them to the ground. He removed their clothes and tied them together using their shoe laces. Defendant forced the boys to orally copulate each other. He also forced one boy to orally copulate him and then he sodomized the boy. Defendant fled on one of the boys' bikes and was later arrested.

Defendant was prosecuted as an adult. In March 1982, defendant pleaded guilty to commission of forcible lewd and lascivious acts on a child under 14 years of age (Pen. Code, § 288, subd. (b)), forcible oral copulation of a child under 14 years of age (Pen. Code, § 288a, former subd. (c)), forcible sodomy (Pen. Code, § 286, former subd. (c)), and robbery (Pen. Code, § 211). He was sentenced to 25 years in prison.

3

B.    Prison and Parole

Defendant served nearly 13 years of his sentence and sustained numerous disciplinary violations while incarcerated.  He was paroled in December 1994.  Defendant violated parole several times and was returned to custody for months at a time.  While out on parole in 1997, defendant saw a young boy on the street and fantasized about molesting him.  The fantasies were so intense that defendant called his parole agent and asked to be incarcerated in the county jail until the fantasies dissipated.  He was released after four days.  A few days later, defendant violated curfew and a warrant was issued for his arrest.  Defendant was ultimately apprehended near the location where he orally copulated and sodomized his last victims.  SVP proceedings were initiated against defendant while serving time for that parole violation.

C.    SVPA Petitions

The Sacramento County District Attorney filed the initial petition alleging defendant was an SVP in 1997.  Trial on the petition resulted in a hung jury.  Defendant waived his right to a subsequent jury trial and submitted the matter to the court for decision.  In June 1998, the court found the petition true beyond a reasonable doubt and ordered defendant committed to Atascadero State Hospital for a two-year term.  This court affirmed the judgment on appeal.

In May 2000, defendant stipulated that he remained an SVP.  He agreed to extend his commitment until June 2, 2002.

In March 2002, the prosecutor filed a petition to extend defendant's commitment until June 2, 2004 (first extension petition).  In July the court found probable cause to hold defendant over for trial.  Trial on the first extension petition was set for October 2002.  This trial date was subsequently continued several times, both at the request of defendant's counsel and the prosecutor.  Trial was ultimately reset for April 5, 2004.

4

In February 2004, the prosecutor filed another petition to extend defendant's commitment until June 2, 2006 (second extension petition). With both parties' consent, the April trial date on the first extension petition was vacated so the court could conduct a probable cause hearing on the second extension petition prior to trial. Initially set for April 2004, the probable cause hearing commenced in May and was continued to July 2004. The court found probable cause to believe defendant continued to meet the SVP criteria and trial was set in November 2004. The parties requested several continuances and trial was reset for March 28, 2006.

Four days before trial, on March 24, the prosecutor filed another petition to extend defendant's commitment until June 2, 2008 (third extension petition). Trial on the previous extension petitions was vacated to conduct a probable cause hearing on the third extension petition. The probable cause hearing commenced in April, was continued to May, and later concluded in June 2006. The court found probable cause that defendant met the criteria for recommitment as an SVP and continued the matter to August 2006 for further proceedings. The matter was continued over the next two months, either at defendant's request or with his counsel's agreement, and trial was eventually set for March 6, 2007.

We note that the Legislature amended the SVPA in September 2006 to lengthen the term of an SVP commitment from two years to an indeterminate term; a voter initiative that passed in November 2006 made similar changes. (Senate Bill 1128, Stats. 2006, ch. 337, § 55 (eff. Sept. 20, 2006) [amending Welf. & Inst. Code, § 6004]; Prop. 83, §§ 27, 28 (eff. Nov. 8, 2006).]

Because defendant's counsel was in trial on another matter, defendant's trial was continued to the end of the month. The matter was again continued to April 11, 2007, apparently because defendant's counsel was preparing a writ petition to this court challenging whether recent amendments to the SVPA deprived the court of jurisdiction over pending recommitment petitions like defendant's. The writ petition challenging the

jurisdictional issue was later filed in *Bourquez v. Superior Court* (2007) 156 Cal.App.4th 1275, review denied February 27, 2008, (*Bourquez*) defendant was not a named party in the writ petition.

In light of the writ filing, the trial court stayed numerous SVP recommitment cases, including defendant's matter. The prosecutor subsequently filed an amended petition to extend defendant's commitment indefinitely under the amended law.

The trial court continued to stay defendant's case pending the Third District's ruling on the writ petition in *Bourquez*. This court denied the writ in November 2007. (*Bourquez v. Superior Court*, *supra*, 156 Cal.App.4th 1275.)

Following denial of the writ in *Bourquez,* defendant's matter was continued several more times until January 2009. Defendant was present during these hearings and did not object to his counsel's requested continuances. The case was continued twice more to April 10, 2009, after which the court continued the matter on several occasions until August 2009 to address a motion to dismiss filed by defendant.

On August 31, 2009, two days after the court denied the motion to dismiss, defendant's counsel requested a December trial date. To allow a defense expert to review his files and evaluate him, defendant agreed to a trial date on January 6, 2010. The trial was trailed twice at defendant's counsel's request and then reset with defendant's consent to February 22, 2010, due to an unavailability of defense experts and further required preparation.

On February 10, 2010, defense counsel requested a further continuance to May 11, 2010, because he was in trial on another matter. The court granted the continuance over defendant's objection.

The matter was continued five more times until October 19, 2010, sometimes at defense counsel's request and apparently with defendant's consent, and other times due to the lack of an available courtroom.

6

D.    <u>Motion</u> and <u>Writ</u> <u>Filings</u>

Before the case was tried, defendant petitioned several times in the trial court for writs of habeas corpus to dismiss the proceedings and filed several motions to substitute counsel. Between 2007 and 2008, defendant filed two petitions for writs of habeas corpus in the court below challenging the court's jurisdiction over the recommitment petitions in light of the changes to the SVPA as well as the use of certain protocols at his original SVP trial in 1998 and again in the recommitment proceedings. The court denied both petitions.

Defendant filed a third pro. per. petition for writ of habeas corpus in January 2009, claiming he had been denied a speedy trial on the petitions to extend his commitment as an SVP. The writ petition cited *People v. Litmon* (2008) 162 Cal.App.4th 383 (*Litmon*) as support for dismissal. The court summarily denied the petition on February 24, 2009, without prejudice to raising the issue in a motion before the trial court.

Approximately three weeks later, defendant filed a pro. per. motion to dismiss based on *Litmon* raising the speedy trial issue. At the end of May 2009, the court appointed special counsel to represent defendant on the motion to dismiss. After further briefing and argument, the court denied the motion on August 28, 2009, concluding the length of delay was reasonable in light of the factors discussed in *Litmon*.

On February 9, 2010, defendant filed a fourth pro. per. petition for writ of habeas corpus in the trial court asserting his speedy trial rights had been denied but also claiming he was now being forced to go to trial against his will. The court later denied the writ without prejudice to raising the issue in a motion before the trial court. It does not appear, based on the record, that defendant ever filed a motion to dismiss in the trial court following the February 2010 denial of his writ petition. And, although defendant twice raised his claim of denial of a speedy trial by a writ of habeas corpus in the trial court, he did not seek pretrial appellate resolution of that issue.

In addition to the numerous writ petitions, defendant also filed multiple motions under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*), to relieve his appointed counsel, Mr. Saria.  On May 26, 2009, defendant filed a *Marsden* motion, or alternatively, a motion to represent himself pursuant to *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562].  On June 15, 2009, defendant withdrew the motion and agreed Mr. Saria could continue representing him as trial counsel because Mr. Saria knew his case better than any other attorney.  Approximately 10 days later, on June 24, 2009, defendant filed a second *Marsden* motion to relieve Mr. Saria.  Defendant appears to have renewed the motion on August 28, 2009, but three days later withdrew the motion and agreed that Mr. Saria could continue to represent him.

Defendant filed another *Marsden* motion on February 10, 2010.  The court held a closed hearing and denied the motion that same day.  The court found compelling Mr. Saria's testimony, confirmed by the defense's investigator, that defendant agreed to continue trial while he progressed through treatment at the hospital, and that he had no interest in going to trial because he anticipated losing.  The court expressly disbelieved defendant's testimony to the contrary.

  E.  <u>Trial</u> <u>Proceedings</u>

The jury trial to determine whether defendant qualified as an SVP during the period beginning in June 2002 finally commenced in October 2010.  Two expert psychologists, Drs. Longwell and Starr, testified for the People.  Each psychologist met and evaluated defendant approximately 10 times.

The psychologists reviewed reports from defendant's first commitment, probation reports, his legal history, hospital records, and notes by his treatment team.  They diagnosed defendant as currently suffering from several mental disorders, including pedophilia (sexually attracted to prepubescent boys, nonexclusive), bipolar two disorder

in partial remission, antisocial personality disorder, sexual sadism, and personality disorder not otherwise specified with antisocial and borderline features.

In addition to interviewing defendant and reviewing his records, Drs. Longwell and Starr used a variety of actuarial tools to assess defendant's risk if released. Each of these risk assessment tools put defendant in the high risk category for reoffending. Based on defendant's criminal and medical history, defendant's failure to complete all phases of treatment while committed at the hospital and while out on parole, and defendant's high risk scores on the actuarial instruments, Drs. Longwell and Starr testified that defendant had a substantial, well-founded risk of reoffending and they did not believe defendant could control his behavior if released into the community.

Two experts testified for the defense. Dr. Heard challenged the adequacy of the actuarial tools used to predict whether defendant could control his behavior or whether he was likely to reoffend, but he conceded that he had never evaluated defendant or reviewed his records. Dr. Podboy testified that he evaluated defendant twice and diagnosed him with pedophilia by history, meaning defendant previously suffered from pedophilia but that currently he did not suffer from the disorder. In Dr. Podboy's opinion, defendant could control his behavior and was unlikely to commit violent sexual acts if released. Unlike the prosecution experts, he did not use any actuarial instruments when evaluating defendant but instead relied on his observations and clinical judgment alone.

The jury found the allegations in the petition to be true, and the trial court ordered defendant committed for an indeterminate term as an SVP. This appeal followed.

DISCUSSION

I

*Sufficient Evidence Supports the Verdict*

Defendant contends insufficient evidence supports the jury's finding that he is an SVP because evidence regarding the etiology, or cause, of his diagnosed mental disorder --pedophilia--is lacking. We disagree.

The requirements for classifying someone as an SVP are set forth in section 6600. The statute defines a "[s]exually violent predator" as "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1).) The phrase "[d]iagnosed mental disorder" includes "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (§ 6600, subd. (c).) Thus, to commit defendant as an SVP, the jury had to find that defendant was previously convicted of a violent sexual offense and that he suffered from a mental disorder affecting his volitional or emotional capacity thereby making him a danger to others because he was likely to engage in sexually violent criminal behavior. (*People v. Poulsom* (2013) 213 Cal.App.4th 501, 517.)

Defendant does not dispute that his prior convictions qualify as sexually violent offenses within the meaning of the statute. (§ 6600, subd. (b) [defining "[s]exually violent offense" to include violations of Penal Code sections 286, 288, and 288a].) He challenges only the sufficiency of the evidence bearing on the latter requirement. According to defendant, one cannot decide whether a mental disorder makes the person a danger unless one understands the underlying cause or root of the condition itself.

10

But the root cause of defendant's mental disorder is not relevant under the statute. Instead, section 6600 requires only that defendant's *mental disorder causes him to be a danger* to others in that he is likely to engage in sexually violent predatory behavior. (§ 6600, subd. (a)(1).) The underlying etiology of the mental disorder--or what made him a pedophile in the first instance--is simply not in question. When viewed in the proper context, then, the issue is whether the record contains sufficient evidence that defendant is a danger to society because his diagnosed pedophilia makes it likely he will commit predatory acts of sexual violence if released.

We review the entire record in the light most favorable to the judgment to determine whether substantial evidence supports the jury's determination that defendant currently suffers from a diagnosed mental disorder as described by the statute. (*People v. Mercer* (1999) 70 Cal.App.4th 463, 466.) To be substantial, the evidence must be " ' "of ponderable legal significance . . . reasonable in nature, credible and of solid value." ' " (*Ibid.*) " '[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.' " (*People v. Poulsom*, *supra*, 213 Cal.App.4th at p. 518.) If substantial evidence supports the verdict, " 'we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.' [Citation.] This is true even in the context of expert witness testimony." (*Ibid.*) The credibility of an expert and his conclusions are to be resolved by a jury; " '[w]e are not free to reweigh or reinterpret [that] evidence.' " (*Ibid.*) Cognizant of these principles, we turn to examine the record in the present case.

We are satisfied the testimony of the People's experts constitutes substantial evidence supporting the jury's true finding that defendant qualifies as an SVP. At the time of trial, Dr. Longwell had conducted more than 800 SVP evaluations and risk assessments and Dr. Starr had conducted approximately 1,400. In approximately 85 to 90 percent of those SVP evaluations, they concluded the potential committees did not meet

11

the SVP criteria. Thus, Drs. Longwell and Starr were well qualified to offer an opinion about whether defendant satisfied the SVP criteria.

After evaluating defendant over 10 times, Dr. Longwell opined that defendant currently suffers from a mental disorder that causes him to lack the ability to control his sexually violent behavior thus making it likely he would reoffend if released. Her opinion was based on several factors. She described the five phased sex offender treatment program at Atascadero State Hospital as well as a parole outpatient sex offender treatment program, both of which defendant failed to complete. Dr. Longwell linked the significance of defendant's failure to complete either treatment program with his potential to reoffend by citing studies showing those who begin sex offender treatment but do not complete it are at a higher risk for sexual recidivism than those who never begin treatment at all. She testified defendant was highly unlikely to enroll in or complete a sex offender treatment program if released from confinement.

Dr. Longwell also assessed defendant's sexual recidivism risk by considering both static and dynamic actuarial based risk factors associated with sexual recidivism in known sex offenders. Defendant scored in the high risk category on each of the four actuarial instruments commonly used by psychologists to assess such risk. Among other things, defendant's early onset of offending, his institutionalization and separation from his family when he was very young, and his antisocial personality disorder increased defendant's risk of reoffending if released.

Dr. Longwell also expressed her concern that at the age of 30, after having served over 10 years in prison, defendant was almost immediately tempted to molest another young victim he happened to encounter while on parole. His sexually deviant urges were so strong that he was unable to control them himself and he had to request external controls--being placed in jail--to avoid reoffending.

Like Dr. Longwell, Dr. Starr testified to defendant's extremely high scores on the actuarial instruments she administered, which placed him in the highest risk category to

12

recidivate upon release. The fact that all of his victims were strangers also increased his risk of reoffending. Dr. Starr also stated defendant's attendance in the treatment program had been sporadic, that at times he had been removed from the program because he was engaging in sadistic behavior with another patient at the hospital who was also a pedophile with underage male victims, and that he had manipulated and faked treatment results. She also testified that defendant had continued to act out sexually while committed even though defendant was taking Lupron, a drug intended to lower testosterone and decrease deviant sexual thoughts. Although defendant had been committed for a long time, Dr. Starr testified that he still lacked the coping skills and behaviors as well as a relapse prevention plan necessary to keep the community safe if released. All of these factors, in Dr. Starr's opinion, increased defendant's recidivism risk.

While defendant's expert, Dr. Heard, challenged the adequacy of the actuarial tools Drs. Longwell and Starr used to assess whether defendant could control his behavior or whether he was likely to reoffend, he conceded that he in fact had used such tools to conduct risk assessments in other court cases when evaluating child molesters. Dr. Heard admitted he never evaluated defendant or reviewed his extensive hospital records. He conceded his opinion was not based on anything factually related to defendant, and further admitted that research showed a person like defendant who offended against male victims was likely to reoffend at a higher rate than someone who had female victims.

Defendant's other expert, Dr. Podboy, never evaluated defendant using any actuarial tools commonly used in psychology, instead relying solely on his own observations in forming his opinion as to whether defendant was likely to reoffend if released. But as both prosecution expert's testified, relying on a psychologist's clinical judgment alone is not a good indicator of risk; indeed, it is little better than chance. While Dr. Podboy testified defendant was a model patient in the hospital and therefore

13

was unlikely to be dangerous if released, upon cross examination he conceded the contrary. Following his testimony and outside the presence of the jury, the court commented that "it seemed to [the court] the vast bulk of factors upon which his opinion relied upon ha[d] been disproved by evidence presented in court."

The credibility of the experts and their conclusions were matters resolved against defendant by the jury. We are not free to reweigh or reinterpret the evidence. (*Mercer, supra,* 70 Cal.App.4th at pp. 466-467.) Moreover, we must draw all reasonable inferences in favor of the judgment. (*Id.* at p. 467.) The jury could reasonably believe the evidence of the prosecution witnesses and reject that of the defense witnesses. We therefore conclude that sufficient evidence existed from which a rational trier of fact could determine defendant lacked the ability to control his sexually violent behavior and would likely reoffend if released.

To the extent defendant argues the opinions of Drs. Longwell and Starr are too conclusory to support such a finding, we disagree. Defendant's reliance on *Jennings v. Palomar Pomerado Health Systems* (2004) 114 Cal.App.4th 1108 (*Jennings*), a medical malpractice case, is misplaced. At issue in *Jennings* was whether the plaintiff had sufficiently proven a surgeon's negligent act of leaving a retractor in a patient during surgery caused a post-operative infection in a different location than where the instrument was left. (*Jennings, supra,* 114 Cal.App.4th at pp. 1115-1116.) The court had no occasion to consider expert testimony under the SVPA. A case is not authority for a proposition not considered. (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 620.)

Even if *Jennings* were somehow relevant, however, Drs. Longwell and Starr provided reasoned explanations connecting the factual predicates underlying their opinions to their ultimate conclusion that defendant posed a substantial and serious risk to the public if released because he could not control his sexually violent conduct. (*Jennings, supra,* 114 Cal.App.4th at p. 1117 [expert opinion based on assumptions of fact without evidentiary support have no value].) Drs. Longwell and Starr did not, as

14

defendant contends, simply conclude defendant was an SVP because he was a pedophile. Instead, the prosecution's experts linked their ultimate opinion to such underlying facts as the nature of defendant's crimes, the early onset of his offending, the presence of male victims who were strangers to him, his extremely high risk assessment scores, his failure to complete treatment, his antisocial personality disorder, and the lack of a valid relapse prevention plan. This distinguishes their opinions from the one struck down by the court in *Jennings*, which merely relied on conjecture and speculation. (*Id.* at pp. 1115-1116)

## II

### *Instructional Error*

Defendant contends the trial court twice erred when instructing the jury on the requirements for recommitting him as an SVP. First, defendant argues the court failed to separately instruct the jury that he had to have a serious difficulty controlling his sexually violent behavior. We disagree and find the jury was adequately instructed. Second, defendant argues the court should have instructed the jury that his alleged amenability to voluntary treatment lessened his chance of reoffending. Even if the court erred in instructing the jury regarding the amenability to treatment, defendant's second claim fails for lack of prejudice given the evidence and arguments presented during trial.

### A.     Control Instruction

Defendant argues the trial court had a sua sponte duty to instruct the jury that it had to find defendant had a serious difficulty controlling his sexual behavior before it could commit him as an SVP. We determine independently whether a jury instruction correctly states the law. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088 [court "determine[s] whether a jury instruction correctly states the law under the independent or de novo standard of review"].) Our task is to determine whether the trial court " 'fully and fairly instructed on the applicable law.' " (*Ibid.*) We consider the instructions as a whole as well as the entire record of trial, including the arguments of counsel. (*People v.*

15

*Franco* (2009) 180 Cal.App.4th 713, 720.) If reasonably possible, instructions are interpreted to support the judgment rather than defeat it. (*Ibid.*) We conclude the court had no duty to give a separate "control" instruction.

The court instructed the jury with CALCRIM No. 3454, which generally recites the language of section 6600 and case law interpreting the statute. The instruction contains three elements the People must prove beyond a reasonable doubt: "1. (He/She) has been convicted of committing sexually violent offenses against one or more victims; [¶] 2. (He/She) has a diagnosed mental disorder; [¶] [AND] 3. As a result of that diagnosed mental disorder, (he/she) is a danger to the health and safety of others because it is likely that (he/she) will engage in sexually violent predatory criminal behavior (;/.)" (CALCRIM No. 3454 (2009-2010 ed.) at p. 1051.) A fourth element is required if evidence has been introduced at trial on the issue of amenability to voluntary treatment in the community. Under those circumstances, the court is directed to instruct the jury that the People must also prove: "4. It is necessary to keep (him/her) in custody in a secure facility to ensure the health and safety of others." (*Ibid.*) The trial court instructed the jury on the first three elements under CALCRIM No. 3454, but not on the fourth.

Defendant concedes the Supreme Court has determined an instruction that tracks the statutory language, like the one given here, necessarily includes the concept of serious difficulty in controlling one's behavior and negates any need for a separate "control" instruction. (*People v. Williams* (2003) 31 Cal.4th 757, 759 [the statutory language "inherently encompasses and conveys to a fact finder the requirement of a mental disorder that causes serious difficulty in controlling one's criminal sexual behavior"].) Nonetheless, defendant argues a specific control instruction was required based on the prosecution's opening statement and closing argument, which, according to defendant, suggested that a mere diagnosis of pedophilia could satisfy the SVPA requirements without regard to whether it affected defendant's ability to control his sexual behavior. The record belies his argument.

16

A review of the prosecutor's arguments during trial reveals nothing misleading. In her opening statement, the prosecutor plainly set forth that the jury was tasked with determining whether defendant had been convicted of a qualifying offense, whether he suffered from a diagnosable mental disorder, and whether that mental disorder made him a danger to the health and safety of others such that it was likely he would engage in sexually violent predatory behavior if released. The prosecutor's argument did not suggest that the jury had to decide only that defendant suffered from a diagnosed mental disorder before committing him as a SVP.

The prosecutor's closing argument similarly framed the three issues facing the jury. "[T]o keep you focused you may want to get a pad and paper and have someone write down your three requirements, the three things that you're being asked to find to guide your discussions." And, throughout her closing, the prosecutor also emphasized defendant's inability to control his behavior. "He knows his sexual attacks on these children are wrong and he cannot control himself." "He cannot control himself. He cannot control himself. And that is as of 2009." "And experts have told us without question that this is someone who is not yet in a position where he can demonstrate that he can control his behavior." Had the prosecutor argued the mere diagnosis of a mental disorder was sufficient, there would have been no need to focus on defendant's lack of control.

Even assuming the smallest possibility that the jury's task was unclear, defense counsel readily cleared up any possible misconception by repeatedly focusing on the control issue during his closing. For example, counsel stated, "What I'm asking you is this, this question: Does this conduct prove to me beyond a reasonable doubt that he cannot control himself? Because that is the legal requirement. Serious difficulty controlling himself." Defense counsel further cautioned the jury: "And as Dr. Longwell said, the fact that you have that diagnosis does not automatically mean that meets Criteria B. There still has to be the parts of affecting ability to control and predisposition issues."

17

Based on defendant's closing argument, the jury was well aware of the need to consider whether defendant suffered from a control-impairing disorder that made him dangerous to the public because he was likely to commit sexually violent predatory acts.

The instruction given by the court adequately informed the jury that "one is not eligible for commitment under the SVPA unless his or her capacity or ability to control violent criminal sexual behavior is seriously and dangerously impaired." (*Williams, supra,* 31 Cal.4th at pp. 776-777.) The prosecutor's opening and closing statements, moreover, did not suggest that a pedophilia diagnosis alone was sufficient to recommit defendant as an SVP. And the defense closing argument repeatedly stressed the need to find defendant's diagnosed mental disorder rendered him unable to control his sexually violent conduct. No further clarifying instruction was required.

B.     Amenability to Treatment Instruction

Defendant's challenge regarding the necessity of an amenability to treatment instruction is two-fold. First, citing *People v. Grassini* (2003) 113 Cal.App.4th 765 (*Grassini*), defendant argues the court had a sua sponte duty to instruct the jury that evidence of amenability to voluntary treatment in the community was relevant to whether he was likely to reoffend under section 6600. Because the court failed to so instruct the jury, defendant contends reversal is required.

Second, defendant challenges CALCRIM No. 3454 to the extent it directs a trial court to instruct the jury that the People must also prove "[i]t is necessary to keep (him/her) in custody in a secure facility to ensure the health and safety of others" whenever evidence is introduced at trial on the issue of amenability to voluntary treatment in the community. (CALCRIM No. 3454, *supra*, at p. 1051 [quoting element 4 of the instruction].) Defendant argues the above-quoted language regarding the necessity of keeping a person in a secure facility does not adequately convey the concept of amenability to voluntary treatment and its relevance in determining a person's ultimate

18

dangerousness for reoffending as set forth in *Grassini*. We address each challenge in turn.

*Grassini* held that where evidence is presented that a person is amenable to voluntary treatment in the community, the court has a sua sponte duty to instruct on the necessity of custodial treatment to keep society safe. (*Grassini, supra,* 113 Cal.App.4th at p. 777.) Even if we assume the evidence defendant cites was sufficient to trigger the sua sponte duty to instruct the jury as described in *Grassini*, we are satisfied the court's failure to so instruct was harmless beyond a reasonable doubt given the evidence presented and the arguments of counsel. (*Grassini, supra,* 113 Cal.App.4th at p. 778 [failure to instruct on the concept of amenability to treatment was harmless beyond reasonable doubt]; *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711].) The jury was adequately informed of the amenability to voluntary treatment concept and would not have come to a different result had it been so instructed. (*Grassini, supra,* 113 Cal.App.4th at p. 778.)

The evidence at trial showed the following. Defendant often failed to engage in meaningful treatment, dropped out or stopped going when he did not feel like attending, and faked treatment responses. Defendant testified that he gave the appearance of progressing through the program, but in reality, he acknowledged he was not. Defendant also consistently lied and manipulated people. Defendant even admitted to lying while testifying about his post release plans to move to Chicago to live with an apparently fictional person named John.

Given defendant's failure to complete treatment while on parole and during his confinement, Dr. Longwell opined that he was unlikely to obtain, much less complete, voluntary sex offender treatment if released from custody. (*People v. Ghilotti* (2002) 27 Cal.4th 888, 926 [evaluators can consider whether a person "can be trusted to pursue the necessary treatment voluntarily upon release"].) Dr. Starr testified that in her opinion defendant needed to remain in a locked facility to continue treatment.

19

Based on such evidence, the prosecutor argued defendant had not been sufficiently rehabilitated and that defendant was at high risk for reoffending because he could not control his violent sexual impulses. The prosecutor told the jury it had to decide whether defendant "need[ed] to stay in the hospital and finish the treatment program," and that defendant was trying to "manipulate his way through the system." She characterized defendant's attitude towards participating in treatment as "I should be able to go when I feel like it, and if I don't feel like it, I ain't going." She summed up her argument as follows: "[Defendant] is willing to tell us what he thinks we want to hear, what he thinks you want to hear; that he will seek and maintain programs voluntarily out in the community. He doesn't have to pay for treatment that is being offered for him in the hospital and he cannot even demonstrate a commitment to that treatment there . . . [Defendant] would drop out and not complete any program voluntarily if he ever signed up at all."

Defense counsel argued defendant was unlikely to reoffend because he could effectively control his behavior. Counsel argued defendant agreed to engage in treatment if released and discussed defendant's relapse prevention plan. In response to the prosecutor's argument that defendant's historic failures in attending treatment made it unlikely he would voluntarily attend treatment if released, defense counsel noted defendant had engaged in treatment for 14 years, and that he only missed treatment sessions as a means of protest through civil disobedience. Rather than showing defendant was unlikely to voluntarily attend treatment in the community, defense counsel argued missing treatment sessions actually demonstrated that defendant had volitional control and would be unlikely to reoffend.

The issue of whether defendant was amenable to undergoing voluntary treatment in the community if released from custody thereby reducing his dangerousness was thus placed squarely before the jury. On this record, we conclude that there is no reasonable

20

possibility the jury would have arrived at a result more favorable to defendant had the language at issue been included in the instruction.

As to defendant's latter claim that CALCRIM No. 3454's language regarding the necessity of keeping a person in a secure facility does not adequately convey the concept of amenability to treatment, we need not resolve the issue here. It is undisputed the trial court did not include this language when instructing the jury with CALCRIM No. 3454. The meaning and import of that precise language, then, is not before the court for consideration. Accordingly, we do not decide whether CALCRIM No. 3454 as presently written adequately conveys the concept of amenability to treatment. (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1182, fn. 18 [court need not address broader issues not presented by particular case on appeal].)

### III

### *Marsden Motion*

Defendant contends the court erred in denying the *Marsden* motion he filed on February 10, 2010, to dismiss his counsel, Mr. Saria. Assuming that *Marsden* applies in the civil commitment context (*People v. Leonard* (2000) 78 Cal.App.4th 776, 784 [assumed for sake of argument that *Marsden* principles applied in civil commitment proceedings]), we conclude the court was well within its discretion to deny the motion.

The legal principles governing a *Marsden* hearing are well settled. " ' " 'When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. [Citation.] A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citations].' " ' " (*People v. Barnett* (1998)

21

17 Cal.4th 1044, 1085.) We review the denial of a *Marsden* motion for an abuse of discretion. (*Ibid.*) "Denial 'is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would "substantially impair" the defendant's right to assistance of counsel. [Citations.]' " (*Ibid.*)

The crux of defendant's argument rests on several alleged conflicts of interest, which he claims required the court to relieve Mr. Saria as appointed counsel. None of the perceived conflicts, however, mandated such action.

Relying on *People v. Johnson* (1980) 26 Cal.3d 557 (*Johnson*), defendant first claims the court should have appointed new counsel when, over defendant's objection, Mr. Saria requested to continue trial from February to May 2010 due to competing client responsibilities, or, at a minimum, inquired as to whether substitute counsel could have brought defendant's case to trial more promptly. We disagree.

*Johnson* involved Penal Code section 1382 and whether a public defender's conflicting obligations to other clients constituted good cause to continue a criminal defendant's trial beyond the 60 day statutory deadline where the defendant objected to the delay. (*Johnson, supra,* 26 Cal.3d at p. 561.) Penal Code section 1382's statutory provisions are not at issue here and there is no equivalent statutory deadline for trying SVP cases. (*People v. Sanders* (2012) 203 Cal.App.4th 839, 846 [SVPA does not specify a time by which a commitment proceeding trial must commence].)

Moreover, this case is distinguishable because nothing in the *Johnson* opinion indicates the defendant did not want to go to trial. Indeed, he refused to consent to the delay so that he could be tried in a timely manner. (*Johnson, supra,* 26 Cal.3d at p. 564.) Defendant, by contrast, repeatedly made clear he did not want to go to trial at all. Based on such representations, the trial court reasonably could have assumed defendant would not have cooperated with new counsel in getting the case to trial even if the court had inquired whether substitute counsel could try the case more promptly.

22

The record also demonstrates that defendant believed Mr. Saria knew his case better than any other attorney, that very few counsel handled cases like defendant's, that defendant had already been represented by one such attorney who later declined to continue representing him due to the nature of defendant's crimes, and that he objected to being represented by one of the only other attorneys that defended SVP cases. The chance of securing substitute counsel in a timely manner was therefore remote.

Defendant's second argument that the court erred in denying his *Marsden* motion because Mr. Saria was a former prosecutor is unavailing. The fact that Mr. Saria filed the May 2000 petition seeking to recommit defendant as an SVP is not problematic. It demonstrates nothing more than that, *as of May 2000*, Mr. Saria believed defendant qualified as an SVP. Defendant apparently agreed because he stipulated to the allegations of the petition. But each commitment proceeding under the SVPA "is a new and independent proceeding at which, with limited exceptions, the petitioner must prove the defendant meets the criteria, including that he or she has a currently diagnosed mental disorder that renders the person dangerous." (*People v. Munoz* (2005) 129 Cal.App.4th 421, 429.) There is nothing in the record suggesting that after the commitment expired on the May 2000 petition, Mr. Saria still believed defendant then suffered from a diagnosable mental disorder as defined by the statute in the new cases that had since been filed against defendant and in which Mr. Saria had never participated.

Defendant's reliance on *Younger v. Superior Court* (1978) 77 Cal.App.3d 892, is misplaced. *Younger* considered whether a former criminal defense attorney who later became third in command at the district attorney's office necessarily disqualifies the entire district attorney's office from prosecuting felony cases handled by his previous law firm or its successor. (*Younger, supra,* 77 Cal.App.3d at p. 894.) Nothing in the opinion addressed the propriety of a former prosecutor representing a potential civil committee in a subsequent and distinct civil commitment proceeding. (*Santisas v. Goodin, supra,* 17 Cal.4th at p. 620 [a case is not authority for propositions not considered].)

23

Defendant's third argument--that counsel waived time without defendant's permission--is easily disposed of given the trial court's express finding below crediting counsel's testimony that defendant agreed to postpone trial to allow him an opportunity to seek treatment as a means of increasing his chance of success before a jury. Although defendant testified he never agreed to waive time or continue the trial, the court resolved the factual conflict against defendant and in favor of Mr. Saria by expressly crediting Mr. Saria's testimony over defendant's. " 'To the extent there was a credibility question between defendant and counsel at the hearing, the court was "entitled to accept counsel's explanation." [Citation.]' " (*People v. Jones* (2003) 29 Cal.4th 1229, 1245.)

In addition to counsel's representations during the *Marsden* hearing as well as counsel's responsive declaration on the motion to dismiss, other evidence in the record also supports defense counsel's claim that defendant strategically agreed to delay trial. For example, defendant's amendment to his motion to dismiss confirms such a strategy. And, at a show cause hearing in 2001, the judge told defendant the following: "And I would suggest [the testifying psychologist] has hope on the horizon if you can get your act together, stay on your medications, and no more of this acting out in the institution. You need to have--if you have any hopes of having a jury rule for you, you need to have the next year to be pretty clean. [¶] Do you understand what I am saying?" Defendant responded that he did. This evidence suggests that at an early date defendant recognized he would be better off strategically if he continued positively progressing in treatment at the hospital.

Defendant's final contention is that the court should have granted the *Marsden* motion because Mr. Saria unjustifiably refused to file a motion to dismiss under *Litmon* for violating his speedy trial rights. Defendant argues Mr. Saria was ineffective and thus should have been relieved as counsel because he did not file a second *Litmon* motion to address the delay since August 2009 when the court denied defendant's first *Litmon* motion. For the reasons set forth below, we conclude no speedy trial violation occurred.

24

Accordingly, Mr. Saria could not have been ineffective for failing to bring a second *Litmon* motion and the court was justified in rejecting defendant's argument that his refusal to do so required relief under *Marsden*.

The record amply supports the trial court's ruling denying defendant's *Marsden* motion. The record clearly shows the trial court provided defendant with the opportunity to voice his concerns, heard from Mr. Saria and the defense investigator, and upon considering those concerns reasonably found them to be insufficient to warrant relieving trial counsel. We therefore find no basis to conclude the trial court either failed to conduct a proper *Marsden* inquiry or abused its discretion in declining to substitute counsel. (*People v. Hart* (1999) 20 Cal.4th 546, 603.)

IV

*Speedy Trial*

Defendant contends the trial court erred in refusing to consider the merits of his February 9, 2010 habeas corpus petition, which sought dismissal under *Litmon* based on the alleged excessive delay in resolving his matter. (*Litmon, supra,* 162 Cal.App.4th 383.) Even assuming the court erred by not considering the writ petition on the merits (*Johnson*, *supra*, 26 Cal.3d at pp. 573-574 [trial court should have considered criminal defendant's petition for writ of habeas corpus raising alleged violation of Penal Code section 1382, which addresses a criminal defendant's statutory right to a speedy trial]), we conclude defendant's argument fails for want of prejudice as defendant's right to a speedy trial was not violated.

Defendant first raised the speedy trial issue under *Litmon* in or about January 2009 when he filed a habeas corpus petition in the court below. The court denied the petition without prejudice to raising the issue in a motion before the trial court. Defendant filed such a motion in March 2009, and the court appointed special counsel to represent defendant on the motion. In August 2009, after full briefing and a hearing on the merits,

25

the court balanced the *Litmon* factors against defendant, determining he had suffered no speedy trial violation. Defendant did not seek pretrial appellate resolution of the issue. Nor does he directly challenge the court's ruling on the motion to dismiss on appeal.

Defendant filed a second habeas corpus petition in February 2010 asserting another speedy trial challenge under *Litmon*. Like before, the court denied the petition without prejudice to raising the issue via motion before the trial court. It does not appear defendant ever filed a second motion to dismiss. Nor did defendant seek pretrial appellate review of the 2010 writ petition denial. Instead, he challenges the denial here.

"The SVPA does not specify a time by which a trial on a commitment proceeding must be commenced or concluded." (*People v. Sanders, supra,* 203 Cal.App.4th at p. 846.) "Though the constitutional right to a speedy trial applies only in criminal prosecutions, the federal due process clause extends to involuntary civil commitments under the SVPA and requires a hearing ' " 'at a meaningful time and in a meaningful manner.' " ' " (*Ibid.* [quoting *Litmon*].) In determining whether a hearing has been unconstitutionally delayed, "we look to the standards and precedents established in the analogous criminal context for guidance." (*Id.* at p. 847.) In criminal proceedings, the essence of a speedy trial violation is that the passage of time has frustrated a defendant's ability to defend the allegations against him. (*Ibid.*)

Because defendant does not expressly challenge the court's August 2009 denial of his motion to dismiss, any delay occurring between 2002 and August 28, 2009, is not at issue. (*Heavenly Valley v. El Dorado County. Bd. of Equalization* (2000) 84 Cal.App.4th 1323, 1345, fn. 17 [points not raised under an appropriate heading need not be addressed]; Cal. Rules of Court, rule 8.204(a)(1)(B) [each brief must state each point under a separate heading or subheading summarizing the point].) In any event, we find the trial court was amply justified in denying the motion to dismiss.

The court engaged in a careful balancing process within the context of this particular case as required by *Litmon*. (*Litmon, supra,* 162 Cal.App.4th at p. 398 ["The

inquiry 'necessitates a functional analysis of the right in the particular context of the case' since the right to a speedy trial is relative"].) The court considered such factors as the length of the delay, the reason for the delay, when defendant asserted his right to a trial, whether defendant suffered any prejudice as a result of the delay, and whether he had suffered oppressive pretrial incarceration.

Based on the evidence presented by the parties, including a declaration submitted by Mr. Saria, the court found defendant made a conscious decision to delay trial in order to continue treatment as a means of improving his chances before a jury. The viability of this strategy was confirmed by the special counsel appointed to represent defendant on his motion to dismiss: "As mentioned in Mr. Rainwater's declaration he has also completed a considerable amount of rehabilitation, a program which is actually chosen by few individuals facing SVP petitions, and based on recent litigation, a crucial factor in the outcome on the SVP trials."

After finding defendant consented to the delay in order to better his chances before a jury, the court also found that rather than impair his defense, the delay strategy likely improved his chances of success. This finding is confirmed by the statements of defendant's special counsel quoted above. The court also concluded that confinement in the hospital was not oppressive as defendant had requested several times to be transferred back to the hospital after being held in the county jail prior to court appearances.

It is plain the court properly grasped the gravity of the balancing test under *Litmon*. On this record, we cannot say the court erred in balancing the factors against finding a speedy trial violation since unlike in *Litmon* much of the delay was attributable to defendant and his trial strategy, which was for his benefit. (See e.g., *Orozco v. Superior Court* (2004) 117 Cal.App.4th 170, 179 [defendant waives the delay issue where delay attributable to defendant or his counsel]; *People v. Sutton* (2010) 48 Cal.4th 533, 549 [delay caused by the conduct of the defendant or for defendant's benefit constitutes good cause to deny a motion to dismiss].) We also note that defendant

27

engaged in extensive writ and motion practice that also contributed to the delay in bringing the case to trial.

We turn, then, to whether the delay from August 28, 2009, when the court denied defendant's motion to dismiss, until February 9, 2010, when defendant once again raised the speedy trial issue, constituted unreasonable delay. We conclude it did not.

On August 31, 2009, defendant consented to setting the trial on January 6, 2010. On January 6, defense counsel asked to trail the trial until January 13. On January 13, defense counsel requested a further continuance until February 22 due to the unavailability of expert witnesses and also because he needed more time to prepare. Defendant consented to the continuance because it was for his benefit. The record shows that, with the exception of a few days, defendant consented to delaying the trial until February 22, 2010. Where a defendant consents good cause exists to continue the trial date, thereby negating any potential speedy trial violation. (*Johnson, supra,* 26 Cal.3d at p. 563.)

Given the circumstances surrounding defendant's case, and in particular his trial strategy to delay going to trial while he was in treatment, defendant's trial took place in a meaningful time and in a meaningful manner. Thus, no speedy trial violation occurred. Even had the trial court considered defendant's February 9, 2010 writ petition on the merits, we are satisfied beyond a reasonable doubt that the court would have denied the writ. Defendant's challenge therefore fails for want of prejudice.

V

*Ineffective Assistance of Counsel*

The trial court appointed special counsel to represent defendant on his motion to dismiss under *Litmon*. Defendant offers several reasons why his special counsel's performance at the hearing on the motion to dismiss was ineffective. Defendant,

28

however, has failed to carry his burden of establishing prejudice and on that basis we reject his claim.

To establish ineffective assistance of counsel, defendant must show, by a preponderance of the evidence, that his counsel's representation fell below the standard of a competent advocate and a reasonable probability exists that, but for counsel's errors, the result would have been different. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.) A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. (*People v. Bolin* (1998) 18 Cal.4th 297, 333.)

If, however, "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." (*Strickland v. Washington* (1984) 466 U.S. 668, 697 [80 L.Ed.2d 674, 699].) After considering each of defendant's four contentions, we follow that course here, finding that because defendant has failed to establish the requisite prejudice necessary for reversal, we need not consider whether the performance of special counsel fell below that of a reasonably competent attorney.

At the hearing on the motion to dismiss, special counsel did not argue that a potential civil committee could properly challenge the denial of the right to a speedy trial via a petition for writ of habeas corpus. According to defendant, had she done so, the court would not have counted the period from January 2009 to March 2009 against defendant in determining whether any delay was reasonable under *Litmon*. That period represented the time between when defendant filed his first habeas corpus petition raising the speedy trial issue and when he filed his motion to dismiss on those same grounds.

But, as the People point out, although the court attributed that period of delay to defendant, the trial court then stated, "in any event," it was denying the motion based on the absence of prejudice in light of defendant's trial strategy of delaying trial in order to seek treatment to increase his chances before a jury. The record thus shows the court

29

would have denied the motion regardless of whether defendant first invoked his right to a speedy trial in January 2009.

Defendant next argues special counsel was ineffective for failing to obtain the transcripts of several hearings because such transcripts would have revealed trial counsel never sought or obtained continuances at those hearings based on the purported trial strategy of allowing defendant to progress further in treatment so as to better his chances before a jury. Even if special counsel had obtained the transcripts, it is not reasonably probable that the court would have ruled differently on defendant's motion to dismiss, however.

This is because it is not uncommon for counsel to avoid disclosing defense strategies and tactics prior to trial. (*People v. Glover* (1985) 169 Cal.App.3d 689, 701 [defendant entitled to prepare any defense he chooses in complete privacy and confidentiality with his attorney].) Revealing the defense strategy to delay trial so defendant could undergo treatment could have put defendant at a distinct disadvantage as it likely would have prompted the prosecution to press for trial sooner thereby cutting off his ability to complete treatment. The fact that the transcripts do not expressly reveal such a strategy is not surprising and does not mean that such a strategy did not in fact exist. Indeed, the evidence suggests that as early as 2001, when the court ruled against defendant at a show cause hearing, that defendant acknowledged he had to have a clean year in the hospital, impliedly including progressing through treatment, if he ever wanted to have a chance of prevailing at a jury trial.

Defendant's third contention--that special counsel was ineffective for failing to know and advise the court that defendant had not been a party to the writ proceedings in this court in *Bourquez, supra*, 156 Cal.App.4th 1275-- is likewise without merit. The cases involved in the *Bourquez* matter were stayed until February 2008 pending the finality of our ruling on the writ. (*Bourquez, supra,* 156 Cal.App.4th at p. 1290.)

30

According to defendant, the court should have been informed that this court's stay in *Bourquez* did not affect his case.

Although it is true that defendant's matter was not included in the *Bourquez* proceedings and thus not subject to the stay imposed by this court, the trial court had itself stayed all SVP cases, including defendant's, pending the outcome of *Bourquez*. Thus, it is not reasonably probable the trial court would have granted the motion had special counsel corrected the trial court's harmless misunderstanding given that a stay was in fact in place for the same period. The particular identity of the court imposing the stay is irrelevant under the circumstances presented here.

Defendant finally contends that special counsel should have impeached representations made by the prosecution that the People had not requested any of the continuances. The record shows the People requested to continue the trial on certain occasions to obtain updated evaluations of defendant, to conduct probable cause hearings, and due to the unavailability of expert witnesses.

While the cause of the delay is undoubtedly relevant, the Supreme Court has made clear that continuances based on the unavailability of witnesses can constitute good cause for delaying trial. (See e.g., *People v. Sutton*, *supra*, 48 Cal.4th at p. 549 ["delay arising from unforeseen circumstances, such as the unexpected illness or unavailability of counsel or witnesses constitutes good cause to avoid dismissal" under Penal Code section 1382].) Moreover, in *Orozco v. Superior Court*, *supra*, 117 Cal.App.4th at p. 175, SVPA commitment proceedings were continued at least once so the People could obtain an updated evaluation interview. The trial court, however, ultimately determined defendant's due process right to a speedy trial had not been violated because a majority of the delay was attributable to defendant's own conduct. (*Id.* at p. 179.)

Similarly, the trial court here determined the overarching cause for the delay was defendant's strategic decision to continue trial to allow him the opportunity to progress through treatment so as to increase his chance of success at any subsequent jury trial.

31

Given the trial court's factual finding, which is supported by substantial evidence in the record, it is not reasonably probable the court would have granted the motion even if special counsel had reminded it that some continuances were at the People's request.

VI

*Equal Protection*

Defendant challenges the constitutionality of the indeterminate recommitment proceedings under the SVPA, arguing his equal protection rights were violated because SVP's are treated less favorably than those committed under other statutes, such as mentally disordered offenders (MDO's) (Pen. Code, § 2960) and those found not guilty by reason of insanity (NGI's) (Pen. Code, § 1026 et seq.).  According to defendant, the Supreme Court's decision in *People v. McKee* (2010) 47 Cal.4th 1172 (*McKee I*), compels us to remand the matter for further proceedings to determine whether the state can meet its burden of showing a compelling state interest in treating SVPs differently than MDO's and NGI's.  We disagree.  (*People v. Kisling* (2014) 223 Cal.App.4th 544, 548 ["the Supreme Court intended [remand proceedings] in *McKee I* to be, as a matter of law, dispositive in all cases on the issue of whether the disparate treatment between SVP's and MDO's/NGI's was justifiable"].)

In *McKee* I, the Supreme Court found that SVPs, MDO's, and NGI's are similarly situated for equal protection purposes because each are involuntarily committed to protect the public from individuals who are dangerously mentally ill.  (*McKee I, supra,* 47 Cal.4th at pp. 1202-1203, 1207.)  The court found no question that after the initial commitment SVP's were treated less favorably because they were given indeterminate commitments with the burden of proving they should be released whereas MDO's and NGI's were committed for a determinate term and had the right to be released unless the People proved beyond a reasonable doubt that he or she should be recommitted.  (*Ibid.*)

32

To justify the disparate treatment of SVP's, the Supreme Court in *McKee I* emphasized the People had to show on remand "that, notwithstanding the similarities between SVP's and MDO's, the former as a class bear a substantially greater risk to society, and that therefore imposing on them a greater burden before they can be released from commitment is needed to protect society." (*McKee I, supra,* 47 Cal.4th at p. 1208.) Whether the People carried their burden under the equal protection clause for such differential treatment was resolved in remand proceedings in *People v. McKee* (2012) 207 Cal.App.4th 1325, review den. Oct. 12, 2012 (*McKee II*).

In *McKee II*, the Fourth District affirmed the trial court's determination that "the People on remand met their burden to present substantial evidence, including medical and scientific evidence, justifying the amended Act's disparate treatment of SVP's (e.g., by imposing indeterminate terms of civil commitment and placing on them the burden to prove they should be released)." (*McKee II, supra,* 207 Cal.App.4th at p. 1347.) The People presented evidence showing " 'that the inherent nature of the SVP's mental disorder makes recidivism as a class significantly more likely[;] . . . that SVP's pose a greater risk [and unique dangers] to a particularly vulnerable class of victims, such as children'; and that SVP's have diagnostic and treatment differences from MDO's and NGI's, thereby supporting a reasonable perception by the electorate that passed Proposition 83 that the disparate treatment of SVP's under the amended Act is necessary to further the state's compelling interests in public safety and humanely treating the mentally disordered." (*Ibid.*) Based on the above, the court concluded "the disparate treatment of SVP's under the Act is reasonable and factually based and was adequately justified by the People at the evidentiary hearing on remand." (*Id.* at p. 1348.) The SVPA, therefore, did not violate equal protection. (*Ibid.*)

Based on *McKee I* and *McKee II*, we agree defendant's equal protection rights were not violated by treating him differently than MDO's and NGI's for commitment purposes because the indeterminate commitment procedures legitimately advance a

compelling state interest in protecting the public from an SVP like defendant who has a substantial, well-founded risk of reoffending and cannot control his behavior and who has violated some of society's most vulnerable members like the very young children defendant has a history of sexually accosting. We therefore reject defendant's equal protection challenge and request for remand.

VII

*Ex Post Facto*

Defendant contends the SVPA is punitive in nature and thus violates the federal prohibition against ex post facto laws. Our Supreme Court considered and rejected a similar argument in *McKee I*. (*McKee I, supra,* 47 Cal.4th at pp. 1193-1195.) As defendant concedes in his reply brief, we are bound by *McKee I*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

VIII

*Double Jeopardy*

Defendant contends the SVPA's purported punitive nature also violates the federal prohibition against double jeopardy. The conclusion that the SVPA is not a penal statute, however, is fatal to defendant's contention. (*McKee I, supra*, 47 Cal.4th at pp. 1193-1195 [SVPA is not punitive and therefore not within the scope of the ex post facto clause]; *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1171 [SVPA intended to provide treatment to, rather than punish, mentally disordered individuals who cannot control sexually violent criminal behavior]; *People v. Superior Court (Williams)* (1991) 233 Cal.App.3d 477, 486-487 [double jeopardy principles apply to criminal prosecutions but they do not apply to civil commitment proceedings].)

34

DISPOSITION

The judgment and order committing defendant to the State Department of Mental Health for an indeterminate term is affirmed.


                                                                    HULL                  , J.


We concur:


       NICHOLSON         , Acting P. J.


       ROBIE                , J.